IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

HENRY LEWIS PATTERSON, "H.L."                                    PLAINTIFF

VERSUS                      CIVIL ACTION NO. 5:10-CV-00153-DCB-JMR

YAZOO CITY, MISSISSIPPI;
YAZOO COUNTY, MISSISSIPPI; and
YAZOO RECREATION COMMISSION                                      DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This cause comes before the Court on Plaintiff's Motion for Partial Summary Judgment [**docket entry no. 104**], Yazoo City's Motion for Partial Summary Judgment [**docket entry no. 105**] and Supplemental Motion for Summary Judgment [**docket entry no. 145**], Yazoo Recreation Commission's Motion for Summary Judgment [**docket entry no. 108**] and Supplemental Motion for Summary Judgment [**docket entry no. 149**], and Yazoo County's Motion for Summary Judgment [**docket entry no. 112**] and joinder in Yazoo City's and Yazoo Recreation Commission's Supplemental Motions [**docket entry nos. 153, 154**]. Having carefully considered said Motions, the Parties' opposition thereto, applicable statutory and case law, and being otherwise fully advised in the premises, the Court finds and orders as follows:

### I. Facts and Procedural History

In 1979, the Mississippi Legislature authorized Yazoo City (the "City") and Yazoo County (the "County") to establish the Yazoo Recreation Commission (the "Commission") to manage and control the

parks and recreation facilities within their joint jurisdictions. S.B. 2954, Reg. Sess., 1979 Miss. Laws 943. The Bill authorizing the Commission's formation provides that the Commission is to be composed of twelve members and jointly funded from municipal and county property taxes. Id. at § 2. The City and the County are each responsible for appointing five Commission members and the municipal and county school boards appoint the remaining two members. Id. Moreover, the City and County must approve the annual budget, id. at § 3, appropriate funds necessary for the Commission's operation, id., concur in all of the Commission's hiring decisions, id. § 5(c), and agree to the Commission's salary and benefit programs for its employees. Id. § 5(d). All other powers are delegated to the Commission. In particular, the Commission is empowered to employ a superintendent to have "actual charge of the parks, playgrounds and recreation facilities and the enforcement and execution of all rules and regulations." Id. § 5(c). It is that responsibility that gives rise to the current Complaint.

In 1997, the Commission promoted Plaintiff H.L. Patterson from the position of assistant superintendent to superintendent,[1] which at the time carried a salary of $40,000 per year. Patterson Dep. at

---

[1] Before becoming the assistant, the Commission employed Patterson as a program director. Patterson Dep. at 35.

35.[2] As superintendent, Patterson was solely responsible for the day-to-day operations of the Commission with duties ranging from supervising personnel, coordinating recreational activities, groundskeeping, and repairing of park facilities and equipment. See generally, Superintendent of Recreation Job Description, docket entry no. 105-4. In addition to these general responsibilities, the job required him to possess the "ability to learn the practices and techniques of modern bookkeeping and purchasing" and may occasionally require the ability to perform manual labor. See id. At all times during his tenure as superintendent, Patterson's position was subject to review by the Commission "on the basis of operational efficiency, results accomplished, and on the basis of public response to departmental activities." Id.

The Defendants contend that, starting around 2004 or 2005, Patterson's job performance began to decline. Patterson testified that around 2004 or 2005 private citizens began to organize and undertake cleanup efforts of the parks, which included picking up litter, cutting grass, and mending baseball fences. Patterson Dep. at 88-91; Guthrie Dep. at 39-40. Also, sometime during that period the Commission's equipment began to fall into disrepair. Patterson Dep. at 88-91; Guthrie Dep. at 39-40. Further, Patterson

---

[2] Excerpts from Patterson's deposition appear in multiple places in the record. In the interest of consistency, the Court will refer to the pagination of the deposition transcript, as opposed to the artificial pagination assigned in CMECF to each individual filing.

acknowledged that budget deficits were not uncommon during his time as superintendent.[3] Patterson Dep. at 178-79, 253-54. Guthrie, the Commission's chairman, testified that at one point during Patterson's tenure the Commission's bank account was overdrawn by as much as $30,000.00. Guthrie Dep. at 32.

In 2009, a new group of commissioners (alternatively referred to hereinafter as "the Board") was appointed to the Commission.[4] Patterson Dep. at 41. The events surrounding the transition from the "old Board" to the "new Board" are unclear, but Patterson understood that the new commissioners intended to demand a better performance from the Commission employees than did the outgoing commissioners.[5] To that end, members of the Board verbally informed Patterson that there were a number of areas where his job

---

[3] Patterson blames the Commission's financial situation on Ardis Russell, a CPA who audited the Board's finances and provided feedback to Patterson and the Board when necessary. Russell was a City employee who had no official position with the Commission but nevertheless appears to have acted as the de facto financial advisor for the Board. See Patterson Aff. at ¶¶ 4-11.

[4] The use of the term Board in this opinion differs from the use of the "Board" in the law establishing the Commission, which refers to the Board of Alderman of Yazoo County, Mississippi as the "Board". S.B. 2954, Reg. Sess., 1979 Miss. Laws 943.

[5] Patterson stated that he threatened to sue some of the members of the outgoing board if they fired him. Patterson indicates that threat had something to do with some of the outgoing commissioners' decisions to step down from the board. Patterson Dep. at 190-91.

performance needed to improve.[6] Guthrie Dep. at 46-47. Moreover, some of the new commissioners began monitoring the employees' performance, Patterson Dep. at 57-61, and shortly thereafter, Patterson claims that three of the five Commission's employees resigned, id. at 42, with at least one employee stating that the new Board's more stringent demands constituted "harassment." Id. at 61. It was also around that time that Patterson understood that the new Board intended to fire him. Id. at 189-91. Tension appears to have arisen between new commissioners and Patterson around this time when Diane Delaware, a Commissioner whom Patterson described "wants this and wants that," attempted to assign tasks to the Commission's secretary, Polly Crumb. Id. at 165-69. Patterson, who believed Crumb to be his personal secretary, told Delaware to stop giving instructions to the Commission's secretary. Id.

Pursuant to its authority, at an April 1, 2009 meeting the Commission unanimously voted to relieve Patterson of his position as superintendent. Minutes of Yazoo Recreation Commission (April 1, 2009), docket entry no. 105-13. Patterson had no prior knowledge of this meeting nor was he present at the meeting, Guthrie Dep. at 45, although he testified that he had learned through informal conversations that his job was in jeopardy. Patterson Dep. at 189-91. The minutes from that meeting cite no specific reasons for the

_____

[6] The record does not clearly indicate that the commissioners clarified that there would be consequences for failing to meet their demand.

decision. See Minutes of Yazoo Recreation Commission (Feb. 19, 2009). In his deposition, Guthrie, the Commission's Rule 30(b)(6) designee, avers that the Commission fired Patterson because of his poor job performance. Guthrie Dep. at 33. Particularly, Guthrie states that the Board fired Patterson for (1) overdrawing the Commission's account by $30,000; (2) sustaining overdraft charges on the Commission's account approximately one-hundred times, (3) not knowing where his employees were, and (4) not maintaining the parks.[7] Id. at 32-33, see also, id. at 89 (stating the members of the Board inspected the Commission's equipment shortly before the decision was made and found it in disrepair). The day after the meeting Guthrie asked Patterson to resign as superintendent. Id. at 31-32. When Patterson refused, Guthrie informed him that his employment with the Commission had been terminated. Id. at 32.

The superintendent position remained unfilled for well over a year after Patterson was fired, although Henry Campbell, the Commission's Program Director, appears to have unofficially assumed most of the Superintendent's duties, with the exception of managing the Commission's finances or making employment decisions for the Commission. Id. at 52-57. On May 7, 2010, almost a year after Patterson had been fired, Campbell submitted a letter to the

---

[7] Guthrie also indicated that he was dissatisfied with the Commission's work prior to his appointment to the Board, testifying that as the Little League commissioner he had witnessed the poor shape of the baseball fields and surrounding grounds. Guthrie Dep. at 39.

Commission requesting a pay raise and the authority to hire another employee. Campbell Letter, docket entry no. 105-11. In January 2011, the Commission promoted Henry Campbell to fill Patterson's former position.[8]

Patterson tells a different story. In his Complaint, he alleges that he was fired because the Commission wanted to replace him with a younger, non-disabled person and thus deprived him of his position without adequate due process of law. See Amended Complaint, docket entry no. 67. Due to health issues, Patterson's right leg was amputated in January 2008. Id. ¶ 21. In September 2008, Patterson's left leg was amputated. Id. Patterson maintains that "[a]t all times prior to and after the amputation of his legs, [he] was fully qualified for the Superintendent of Recreation position, had a successful performance record in the position and met his employer's legitimate expectations." Id. ¶ 23. As evidence of his satisfactory record, Patterson points to the absence of any negative performance evaluations, written warnings, or other evidence that would suggest the Board's dissatisfaction with his job performance. Guthrie Dep. at 31; see, e.g., Pl. Reply Memo. at 8, docket entry no. 120.

Despite his record, however, Patterson claims that immediately prior to his second amputation the Commission sought to replace him

---

[8] The Court can find no evidence of this assertion in the record, although both Parties assent to its accuracy. See Yazoo City Memo. at 8, docket entry no. 106.

with Henry Campbell, a non-disabled, younger employee,[9] and that the Commission then manufactured its reasons for terminating him after he returned to the job with satisfactory results. The record indicates that the City voted to transfer Campbell to the Commission the same month Patterson underwent his second surgery,[10] and less than a month after Patterson was fired from the Commission, the City again voted that Campbell be moved from the City payroll to the Recreation Commission effective April 27, 2009.[11] Sept. 8, 2008 Minutes, docket entry no. 120-6 at 30; April 29, 2009, Minutes, docket entry no. 120-6 at 37. Guthrie testified that after being transferred Campbell performed many of the same tasks performed by Patterson, albeit with lesser pay. Guthrie Dep. at 55 (stating that Campbell did not perform budgeting). In early 2011, Campbell was promoted to supervisor. Patterson suggests that Campbell's transfer and eventual promotion are prima facie evidence

---

[9] Campbell was fifty-one (51) years old at the time Patterson was fired. Patterson was sixty (60).

[10] The September 8, 2008, Minutes of the Regular Meeting of the Board of Mayor and Aldermen of the City of Yazoo City, Mississippi indicate that the City, "after discussion upon motion by Alderman Varner, duly seconded by Alderwoman Williams, the Board of Mayor and Aldermen voted unanimously to increase the Parks and Recreation Commission budget by $40,000.00 beginning October 1 making Henry Campbell an employee of the P&R Commission thus eliminating the city's recreation budget." Sept. 8, 2008 Minutes, docket entry no. 120-6, pg. 30.

[11] The Minutes provide: "Alderman Varner moved that Henry Campbell be moved from the City Payroll to the Parks and Recreation Commission with an increase of funds by $40,000 a year and all functions of the Wardell Leach Park become under the direction of the Parks and Recreation Commission effective April 27."

of his claims.[12]

Accordingly, Patterson filed an EEOC charge of discrimination against "Yazoo Recreation Commission, et al." on August 13, 2009.[13] Almost a year later, the EEOC denied Patterson's claim for benefits under the ADA concluding that "[t]he Respondent employs less than the required number of employees or is not otherwise covered by the statutes." Dismissal and Notice of Rights, docket entry no.  67-1. Patterson then filed a Complaint against the Defendants, alleging violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, et. seq., and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et. seq.[14] Patterson later amended his Complaint to state a 42 U.S.C. § 1983 procedural due process violation. Following discovery, all Parties moved for summary judgment. Patterson moved for summary judgement on his due process claim; Yazoo City on the ADA and ADEA claims, and Yazoo County and the Commission on all claims.

Not long after the Parties completed the briefing of their motions, however, the Court allowed the Defendants to supplement

---

[12] In his deposition, Guthrie testified to having no knowledge of the details of how Henry Campbell came to work for the Commission. Guthrie Dep. at 53.

[13] The charge of discrimination specifically alleges that Yazoo City and Yazoo County jointly fund the Commission and appoint its personnel. Dismissal and Notice of Rights, docket entry no.  67-1.

[14] Prior to his filing of the Amended Complaint in this Court, Patterson obtained a Notice of Right to Sue from the Equal Employment Opportunity Commission ("EEOC").

their motions after it was discovered that Patterson had filed for disability benefits pursuant to the Social Security Disability Insurance ("SSDI") plan shortly before he filed the present lawsuit. Patterson's application with the Social Security Administration ("SSA") now appears in the record. See Patterson SSA Report (Form SSA-3368), docket entry no. 149-1. The application makes a number of factual assertions that the Defendants argue contradict Patterson's testimony provided during his deposition and in his affidavit. On his application, Patterson claims that he became unable to perform his job on January 28, 2008 the date of his first amputation. Id. at § 2. Patterson specifically concludes: "I am in a wheelchair. I am unable to work. I am unable to do any physical work due to inability to walk." Id. at § 2.

After reviewing his application, the Office of Disability Determination Services ("DDS") found Patterson was indeed eligible for disability benefits, stating:

> You state you are disabled and unable to work because of a double amputation, poor circulation in leg, which lead to akd and have had both legs amputated due to pain and poor circulation and now in a wheelchair. You state that you became disabled on 01/28/08. The medical evidence to be considered in your claim has been reviewed along with statements given about your condition(s). It has been determined that you are disabled. However, your disability did not begin until 09/08/08. Based on all of the evidence in your case, this is the date you first became eligible for disability benefits.

DDS Letter, docket entry no. 149-1.[15] The Defendants' supplemental motions suggest that the fact that Patterson is now claiming disability benefits is yet another reason for the Court to deny his ADA and ADEA claims. The Court now turns to consider the merits of the Parties' arguments.

## II. Summary-Judgment Standard

Summary judgment is apposite "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law. An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party." Ginsberg 1985 Real Estate P'ship v. Cadle Co., 39 F.3d 528, 531 (5th Cir. 1994) (citations omitted). The party moving for summary judgment bears the initial responsibility of apprising the district court of the basis for its motion and the parts of the record which indicate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

---

[15] In the letter, DDS explains that it "assists the Social Security Administration in obtaining information on applications for Social Security and Supplemental Security Income benefits and on continuing disability reviews for these benefits." Id.

"Once the moving party presents the district court with a properly supported summary judgment motion, the burden shifts to the non-moving party to show that summary judgment is inappropriate." Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). But the nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Moreover, "[t]he mere existence of a scintilla of evidence is insufficient to defeat a properly supported motion for summary judgment." Anderson, 477 U.S. at 252. The nonmovant must instead come forward with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Summary judgment must be rendered when the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.

The Court is ever mindful that summary judgment should be exercised cautiously in discrimination cases which often require courts to delve into motive and intent. Hayden v. First Nat. Bank of Mt. Pleasant, Tex., 595 F.2d 994, 997 (5th Cir. 1979). Accordingly, with regard to employment discrimination claims,

courts should be hesitant to grant summary judgment based on "potentially inadequate factual presentation." Id. (citations omitted). Nevertheless, summary judgment in favor of the defendant is hardly uncommon in discrimination cases and is appropriate if the plaintiff's claim has no basis in fact. Wallace v. SMC Pneumatics, Inc., 103 F.3d 1394, 1396 (7th Cir. 1997).

### III. ADA and ADEA Claims

1. *Whether the City, County, or Commission Are "Employers" Subject to an ADA and ADEA suit*

"Determining whether a defendant is an 'employer' under Title VII involves a two-step process." Muhammad v. Dallas Cnty. Cmty. Supervision & Corrs., 479 F.3d 377, 380 (5th Cir. 2007) (citing Deal v. State Farm Cnty. Mut. Ins. Co., 5 F.3d 117, 118 n.2 (5th Cir. 1993)). The court must first decide if the defendant is an 'employer' as defined by the relevant statute. Muhammad, 479 F.3d at 380 (citation omitted). If the defendant qualifies as an employer, then the court must determine whether the plaintiff and defendant have an employment relationship. Id. (citation omitted). In the instant case, there is considerable dispute as to whether an employment relationship exists between the City and County and Patterson. As all Parties acknowledge, a finding in the negative would prove fatal to Patterson's ADA and ADEA claims because the Commission alone lacks the requisite number of employees to the pass the first prong of the employer test and therefore would not

be subject to suit under the ADA and ADEA.[16] 42 U.S.C. § 12111(5) (ADA, requiring fifteen (15) employees); 29 U.S.C. § 630(b) (ADEA, requiring twenty (20) employees). The EEOC dismissed Patterson's discrimination charge for precisely this reason. Whether the City, County, or Commission is subject to suit is an element that Patterson most prove in order to sustain his discrimination claims, Arbaugh v. Y&H Corp., 546 U.S. 500, 516 (2006), and is a question of fact to be decided by the fact-finder. Johnson v. Crown Enters., Inc., 398 F.3d 339, 343 (5th Cir. 2005) (suggesting that whether two employees are a single employer is a question of fact); Schweitzer v. Advanced Telemktg. Corp., 104 F.3d 761, 764, 765 (5th Cir. 1997)(reversing a jury verdict for failure to give Trevino instructions); see also, Lyes v. City of Riviera Beach, Fla., 166 F.3d 1332, 1346 n.9 (11th Cir. 2008).

Relying on an Eight Circuit case, Patterson suggests that the City and County, which presumably each employ over fifteen employees,[17] are liable for the acts of the Commission under a joint-agency theory of liability. L. C. Eddy, Inc. v. City of

---

[16] Whether the Commission qualifies as an employer under the statutes in not at issue in this case. All parties appear to agree that it does not.

[17] Again, the Parties do not contest that both the City and County have the required number of employees to be considered an employer as defined by those statutes.

Arkadelphia, Ark., 303 F.2d 473 (8th Cir. 1962).[18] The Defendants
counter that the Fifth Circuit does not recognize a joint-agency
test for Title VII claims; instead, the Defendants propose that a
straightforward analysis of the commonly used "hybrid economic
realities/common-law control test" would reveal that Patterson
cannot be considered an employee of the City and County.
Schweitzer, 104 F.3d at 764 (applying the hybrid test to ADEA
claims) (citing Fields v. Hallsville Indep. Sch. Dist., 906 F.2d
1017 (5th Cir. 1990)(same)); Bloom v. Bexar Cnty., 130 F.3d 722,
726 (5th Cir. 1997) (applying the hybrid test in an ADA suit).[19]

---

[18] L.C. Eddy is not a discrimination case and has limited
application to the case at bar. Further, while both the ADA and
ADEA provide for agency liability, agency in the Title VII context
has been narrowly construed to cover only "supervisory or
managerial employees to whom employment decisions have been
delegated." Muhammad, 479 F.3d at 383; see also, Barrow v. New
Orleans S.S. Ass'n, 10 F.3d 292, 297 (5th Cir. 1994); Deal, 5 F.3d
at 119. The Commission was created to "manage and control all
parks, playgrounds, buildings and other recreational facilities in
the City of Yazoo City and Yazoo County, Mississippi, and to
establish, implement and maintain recreation programs of any and
all kinds, types, and description whatsoever." S.B. 2954 § 2, Reg.
Sess., 1979 Miss. Laws 943. The Commission, having been created for
this distinct purpose, does not qualify as an agent of the City and
County subject to ADA and ADEA liability.

[19] The tests for determining who is an employer subject to suit
under the ADA and ADEA are borrowed from Title VII precedent. See,
e.g., Bloom, 130 F.3d at 725. Because the ADA and ADEA were modeled
on Title VII, see, e.g., O'Loghlin v. Cnty. of Orange, 229 F.3d
871, 876 (9th Cir. 2000) (ADA); Gross v. FBL Fin. Servs., Inc.,
557 U.S. 167, --, 120 S. Ct. 2343, 2356 n.6 (2009) (ADEA), and because
the same tests for determining the existence of an employment
relationship are used interchangeably between Title VII and ADA and
ADEA claims, the Court does not distinguish between different types
of employment discrimination statutes, e.g., race, gender, age,
disability, throughout its discussion of whether the County and

Further, the Defendants state that, to the extent Patterson's joint-agency theory of liability can be recharacterized as alleging that the City, County, and Commission constitute a single-employer, application of the relevant Trevino test is foreclosed by Fifth Circuit precedent.

In employment discrimination cases, the Fifth Circuit uses two tests for ascertaining whether a plaintiff-employee has a relationship with an alleged defendant-employer.[20] The Trevino test, the earlier of the two tests to appear in this circuit, was developed by the National Labor Relations Board ("NLRB") for the purpose of analyzing "whether consolidation of separate private corporations is proper in determining the relevant employer for purposes of enforcing the National Labor Relations Act." Trevino v. Celanese Corp., 701 F.2d 397, 404 n.10 (5th Cir. 1983).[21] Many circuits have found the NRLB test is aptly suited for the same

_____

City can be considered Patterson's employer. The court notes, however, that the ADEA differs from other discrimination cases in that an employer must employ twenty (20) or more employees to be subject to suit.

[20] The single-employer test is often referred to as the single-enterprise test, the integrated-enterprise test, and sometimes the joint-employer test. See Gogreve v. Downtown Dev. Dist., 426 F. Supp. 2d 383, 390-91 & n.17 (E.D. La. 2006); see also Turner v. Baylor Richardson Med. Ctr., 476 F.3d 337, 344 (5th Cir. 2007)(referring to the single-employer test at the joint-employer test).

[21] Developed by the National Labor Relations Board, the Trevino test is commonly referred to as the NLRB test in other jurisdictions. See, e.g., Lyes, 166 F.3d at 1341-42.

purpose in the employment discrimination context because of the similarities between the NLRA and Title VII. Lyes, 166 F.3d at 1341 (citing Armbruster v. Quinn, 711 F.2d 1332, 1336 (6th Cir. 1983)); see also Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235, 1241 (2d Cir. 1995); Childs v. Local 18, Int'l Bhd. of Elec. Workers, 719 F.2d 1379, 1382 (9th Cir. 1983). Similarly, the Fifth Circuit uses the NLRB or Trevino test for determining whether two superficially distinct entities are so interconnected that their employees can be aggregated for the purposes of meeting the definition of employer in a discrimination suit. Schweitzer, 104 F.3d at 764.

The alternative test, known as the "hybrid economic realities/common law" control test, was developed after the Trevino test to determine whether the plaintiff and a single defendant-employer have an employer-employer relationship. See, id. at 764. For example, this test is useful when questions arise as to whether a single plaintiff-employee should be considered an employer or independent contractor of a single-defendant entity. Id. at 764 n.2. In other words, when applying this test the Court focuses on the relationship between the plaintiff-employee and the alleged defendant-employer. Id. The hallmark of the hybrid test is whether the alleged defendant-employer had the "right to control" the plaintiff. Deal, 5 F.3d at 119.

The Schweitzer Court carefully distinguished between the utility of the two tests:

17

> [T]he hybrid test should be used as an initial inquiry to
> resolve, if need be, whether a plaintiff is an employee
> of the defendant (or one of the defendants, in a multi
> defendant case) for the purposes of Title VII. If the
> plaintiff is found to be an employee of one of the
> defendants under the hybrid test, but questions remain
> whether a second (or additional) defendant is
> sufficiently connected to the employer-defendant so as to
> be considered a single employer, a _Trevino_ analysis
> should be conducted.

Put simply, the _Trevino_ test applies to the relationship between
multiple employers-defendants, and the hybrid test applies solely
to the relationship between the plaintiff and a single employer-
defendant. Reduced to these terms, it is clear in the present case
that the _Trevino_ test is the more appropriate to the present
scenario because it is uncontroverted that the Commission was
Patterson's employer. The disputed issue before the Court is
whether the City, County, and Commission were so interconnected
that they constitute a single-employer for the purposes of ADA and
ADEA liability. A lengthy analysis would not be necessary, however,
had the _Trevino_ court not stated in a footnote that the four-part
"standard is not readily applicable to governmental subdivisions."
_Trevino_, 701 F.2d at 404 n.10 (citing _Dumas v. Town of Mt. Vernon_,
612 F.2d 974, 979 n.9 (5th Cir. 1980), _overruled on other grounds
by Larkin v. Pullman-Standard Div., Pullman, Inc._, 854 F.2d 1549
(11th Cir. 1988)).

Over the last twenty or so years, this _Trevino_ dictum has
gained favorable treatment. _Turner v. Baylor Richardson Med. Ctr._,
476 F.3d at 344 (5th Cir. 2007)("Further, our prior case law

18

*suggests* that a government employer, such as RHA, may not be considered part of an integrated enterprise under the <u>Trevino</u> framework." (emphasis added)); <u>Garrett-Woodberry v. Miss. Bd. of Pharmacy</u>, 300 Fed. Appx. 289, 291 (5th Cir. 2008) (unpublished) ("It *seems* clear that the 'single employer' test should not be applied here, as the Board is a state agency and is thus a governmental subdivision.") (emphasis added), <u>aff'g</u>, 2008 WL 872444 (S.D. Miss. Mar. 27, 2008) (unpublished) ("[T]his Court finds that the single/integrated and joint employer aggregation theories are not applicable to the present case."); <u>Karagounis v. Univ. of Tex. Health Sci. Ctr. at San Antonio</u>, 168 F.3d 485, at *2 (5th Cir. Jan. 5, 1999) (unpublished table decision) ("[W]e held [in <u>Dumas</u>] that the single employer theory was not applicable when one of the defendants in question was a governmental subdivision."); <u>Ridha v. Texas A & M University System</u>, 2009 WL 1406355, at (S.D. Tex. May 15, 2009) (unpublished) ("The Court directs the parties to Fifth Circuit authority holding that 'integrated enterprise' and 'joint employer' theories do not apply to government employers such as the University Defendant."); <u>Gogreve</u>, 426 F. Supp. 2d at 390 ("The 'joint employer' test laid out in <u>Trevino</u> is not appropriate to analyze the relationship between the Board, the DDD, and the City.").

While the Court acknowledges that the court of appeals and district courts of this circuit appear to follow the rule that

_Trevino_ test may not be used to aggregate seemingly interconnected governmental entities, the effect of this precedent is unclear for two reasons. First and most importantly, in the court of appeal's most recent published opinion on point, it stated that case law "_suggests_ that a government employer, such as RHA, may not be considered part of an integrated enterprise under the _Trevino_ framework." _Turner_, 476 F.3d at 344 (emphasis added). This statement, however, is not a clear expression that the court of appeals embraced this rule.[22] Secondly, the unpublished court of appeals opinions are not binding on this Court.[23] 5th Cir. R. 47.5.4 ("Unpublished opinions issued on or after January 1, 1996 are not precedent."). Even so, this Court hesitates to depart from the rationale of its superior and sister courts.

The _Trevino_ footnote is based on a another footnote in _Dumas v. Town of Mount Vernon, Alabama_, in which court of appeals "decline[d] to apply [the NLRB test] to hold that the Town and the state or county, or all three, are a "single employer." 612 F.2d

---

[22] Further, that the _Trevino_ test does not apply to governmental municipalities was not critical to _Turner_'s holding, and therefore this Court doubts whether the _Turner_ court intended its statement to create a rule of law. Indeed, the fact that the Court did not fully endorse this rule in its holding suggests to this Court that the _Trevino_ test is not automatically foreclosed by Fifth Circuit precedent.

[23] The Court also notes that the latest court of appeal's unpublished decision on point gives as lukewarm an endorsement of the rule as does _Turner_. _Garrett-Woodberry_, 300 Fed. Appx. at 291 ("It _seems_ clear that the 'single employer' test should not be applied here . . . .) (emphasis added).

979 n.9. The Dumas court did not state that the test was
inapplicable *because* the Town, state, and county were governmental
entities; it simply stated that it would not apply the NRLB test to
the existing situation.[24] The Trevino Court cited this statement for
the proposition that the NLRB test is not "readily applicable" to
governmental entities. Again, this statement in a footnote comes
far short of establishing the rule that the NLRB test may not be
applied to aggregated employees of governmental subdivisions. It
merely observed that the test was not "readily applicable." But
see, Garrett-Woodberry, 2008 WL 872444, at *2.

The observation that the NLRB test is not "readily applicable"
to governmental subdivisions has been consistently echoed by courts
that have examined the issue. Some courts have found that the NLRB
test that is ill-suited for its intended purpose in the government
context because it is specifically tailored to private entities.
See, e.g., Garrett-Woodberry, 2008 WL 872444, *3 n.2; Gogreve, 426
F. Supp. 2d at 390; Lyes, 166 F.3d at 1343-44 (citing Trevino, 701
F.2d at 404 n.10); Piper v. Junction City Hous. Auth., 1995 WL
88232, at *3 (D. Kan. Feb. 1, 1995)). Whether or not this test is

---

[24] There are multiple explanations as to why the Court found
the Trevino test inapplicable. For example, neither the state or
county was named as a defendant in Dumas. The plaintiff's single-
employer argument appears to be a last-ditch attempt to find
someone-anyone-who could be counted towards the Town's total number
of employees. It is no surprise that in this instance the Dumas
court refused to apply the NLRB test, as it is arguable whether the
test even applies to parties not named as defendants. See
Schweitzer, 104 F.3d at 764.

an appropriate tool for evaluating the interconnectedness of governmental subdivisions, however, does not answer the question as to what standard, if any, the Court should apply for determining how interrelated political subdivisions should be treated for the purposes of liability. In light of the foregoing cases, it appears that there is no alternative test for making a single-employer or joint-employer type argument in this circuit.[25] The Defendants argue for the hybrid test in the absence of a workable alternative. It seems inappropriate, however, to default to a test whose utility, if Scheweitzer's holding is to be taken literally, has no application to the present scenario in which the Commission was clearly Patterson's primary employer "but questions remain whether a second (or additional) defendant is sufficiently connected to the employer-defendant so as to be considered a single employer." Schweitzer, 104 F.3d at 764.

---

[25] The absence of an applicable test is often diminished by the courts' tendency to apply the Trevino test, despite its unavailability. For instance, the Court of Appeals in Turner applied the Trevino test to determine that Richardson Authority Hospital, a governmental "subunit" of the State of Texas, and Richardson Medical Center Foundation, a non-profit Texas corporation, could not be considered a single, integrated enterprise before suggesting that the Trevino framework was not applicable to their relationship. Turner, 476 F.3d at 341, 344-45; see also, Garrett-Woodberry, 300 Fed. Appx. at 291, aff'g, 2008 WL 872444, at *2-*3 (both courts stating that the plaintiff could not prevail under a single-employer theory even if that theory was available). The courts' continued application of the Trevino test indicates to this Court that either (1) the test may not be as inapposite as courts suggest, or (2) courts are not comfortable that there is no relevant test.

Further, failure to follow Schweitzer's sequential analysis could lead to strange results. For instance, should the Court find that the City and County are liable for the termination of Patterson's employment under the hybrid test, it would seem odd to subject the City or County to total liability, while the Commission, as the primary decision maker, cannot be held liable under the ADA and ADEA. Conversely, should the Court apply the hybrid test and find the City and County had no right to the control Patterson's employment, failure to apply the Trevino test could potentially shield *all* Parties from liability even if they were clearly interconnected, when in the private context, they could incur liability if there was evidence to suggest that they were actively involved in employment decisions. These results are not possible in the private context because in both situations the total number of employees would be aggregated under the single-employer theory to make all Parities liable.

*A. The Hybrid Test*

Under the hybrid test, courts view the "right to control" as the most important consideration in determining whether an entity acted as the employer of the plaintiff. Deal, 5 F.3d at 119. Three factors are particularly instructive regarding that right to control: "whether the alleged employer has (1) the right to hire and fire the employee, (2) the right to supervise the employee, and (3) the right to set the employee's work schedule." Id. at 119

23

(numerals added) (citing Fields, 906 F. 2d at 1020); see also,
Garcia v. Shell Oil Co., 2009 WL 2047898, at *4 (S.D. Tex. July 10,
2009). As to the lesser component of the hybrid test-economic
realities test-district courts may consider a host of factors,[26]
with the most important being whether the "alleged employer paid
the employee's salary, withheld taxes, provided benefits, and set
the terms and conditions of employment." Deal, 5 F.3d at 119
(citing Mares v. Marsh, 777 F.2d 1066, 1068 (5th Cir. 1985)).

        "Federal law controls whether a person is an employer under
Title VII, but courts can look to state law to understand the
nature of the employment relationship." Oden v. Oktibbeha Cnty.,
Miss., 246 F.3d 458, 465 (5th Cir. 2001); see also, Simmons v.
Lyons, 746 F.2d 265, 270 (5th Cir. 1984). After reviewing the law

---

[26] These factors include:

    (1) the kind of occupation, with reference to whether the
    work usually is done under the direction of a supervisor
    or is done by a specialist without supervision; (2) the
    skill required in the particular occupation; (3) whether
    the "employer" or the individual in question furnishes
    the equipment used and the place of work; (4) the length
    of time during which the individual has worked; (5) the
    method of payment, whether by time or by the job; (6) the
    manner in which the work relationship is terminated;
    i.e., by one or both parties, with or without notice and
    explanation; (7) whether annual leave is afforded; (8)
    whether the work is an integral part of the business of
    the "employer"; (9) whether the worker accumulates
    retirement benefits; (10) whether the "employer" pays
    social security taxes; and (11) the intention of the
    parties.

Fields, 906 F.2d at 1020 n.4 (quoting Spirides v. Reinhardt, 613
F.2d 826 (D.C. Cir. 1979)).

creating the Commission, the Court concludes that neither the City or the County can be considered Patterson's primary employer inasmuch as neither had the right to exercise direct control over the terms of Patterson's employment. Senate Bill No. 2955 vests the following powers and duties in the Commission: (a) to make bylaws; (b) to elect officers and appoint employees; (c) to employ a park superintendent; and (d) to fix salary and wages of all employees and "to solely direct them in the discharge of their duties"; and "to discharge employees when found inefficient or for other good cause." S.B. 2954 § 5 (a)-(f), Reg. Sess., 1979 Miss. Laws 943. Thus, the commissioners unquestionably possess the majority of control over the Commission employees, including management of the superintendent. The Commission has the effective right to fire the superintendent and has sole direction over the superintendent's day-to-day activities, which would include authority to set the superintendent's schedule.[27]

The Court is aware that during the course of his employment Patterson used City-owned vehicles; was carried on the City's health insurance plan; and was instructed to communicate directly to the City clerk regarding his equipment and budgetary needs. See generally Knight Dep., docket entry no. 120-11; City Council

---

[27] Under the "right to control test" the only factor that could be interpreted to weigh in Patterson's favor is the City and County's responsibility to concur in the hiring decision of the superintendent. Concurring in hiring decisions does not amount to the ability to control. See Mares, 777 F.2d at 1068.

Meeting Minutes, docket entry no. 120-6. But these economic indicia of control do not override the right to hire and fire, the right to supervise, and the right to set the employee's work schedule. Accordingly, under the hybrid test neither the City or the County can be considered Patterson's employer.

B. The <u>Trevino</u> Test

Under the <u>Trevino</u> framework, the focus shifts from the relationship between the City, the County, and Patterson to the relationship between the City, County, and the Commission. In lieu of focusing exclusively on whether the City or County had the "right to control" Patterson's employment, the Court must consider whether or not the City, County, and Commission had: (1) interrelated operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control. <u>Trevino</u>, 701 F.2d at 404. Of these factors, "centralized control of labor relations" is considered to be the most important. <u>Id.</u> (citing <u>Oaks v. City of Fairhope</u>, 515 F. Supp. 1004 (S.D. Ala. 1981); <u>Fike v. Gold Kist</u>, Inc., 514 F. Supp. 722, 727 (N.D. Ala. 1981); <u>EEOC v. Cuzzens of Ga.</u>, 15 FEP 1807 (N.D. Ga. 1977), <u>rev'd on other grounds</u>, 608 F.2d 1062 (5th Cir. 1979)). Under this prong, courts focus primarily on one question: "which entity made the final decisions regarding employment matters relating to the person claiming discrimination?'" <u>Schweitzer</u>, 104 F.3d at 764; <u>see also</u> <u>Vance v. Union Planters Corp.</u>, 279 F.3d 295,

301 (5th Cir. 2002) (quoting <u>Chaiffetz v. Robertson Research Holding, Ltd.</u>, 798 F.2d 731, 735 (5th Cir. 1986)). Taking the factors together, <u>Trevino</u> instructs courts to "focus on the control a parent company exercises over the employment decisions of its subsidiary." <u>Schweitzer</u>, 104 F.3d at 764.

Courts that have considered the propriety of applying the <u>Trevino</u> test to political subdivisions have found that the third and fourth factors of the NRLB test are particularly unsuited for analyzing the interconnectedness of governmental entities. <u>Lyes</u>, 166 F.3d at 1343; <u>Garret-Woodberry</u>, 2008 WL 87244, at *3 n.2. Any analysis of "common management" or "common ownership or financial control" will not be particularly helpful in this context as governmental subdivisions like the City, County, and Committee "may share sources of ultimate political control or funding, yet be wholly distinct with respect to the day-to-day operations or their control over the relationships of their employees." <u>Lyes</u>, 166 F.3d 1344.[28] Additionally, the "interrelated operations" factor, while perhaps moderately indicative of whether two entities constitute a single-employer,[29] sheds little light on the critical focus of the

---

[28] The Court notes for the record that there is no indication that their was any overlap in membership between the City, County, and Commission.

[29] Application of this factor weighs in favor of the Plaintiff. As stated above, Patterson used City-owned vehicles; Patterson was carried on the City's health insurance plan; Patterson often communicated directly to the City clerk regarding his equipment and budgetary needs. <u>See generally</u> Knight Dep., docket entry no. 120-

single-employer test: whether one entity exercises control over the employment decisions of another. See Schweitzer, 104 F.3d at 764.

After carefully considering the record, the Court is persuaded that Patterson has adduced enough evidence to create a fact issue as to whether Yazoo City exercised control over the Commission's employment decisions, and further, whether the decision to transfer Henry Campbell was related to Patterson's disability. Shortly before Patterson's second amputation, the City voted to transfer Henry Campbell to the Parks and Recreation Commission with $40,000 pay–pay equal to Patterson's. Sept. 8, 2008, Minutes, docket entry no. 120-6 at 30; see Patterson Dep. at 35. Again, following the termination of Patterson's employment with the Commission, the City voted to transfer Campbell back to the Commission. April 29, 2009, Minutes, docket entry no. 120-6 at 37. Tommie Guthrie, then-chairman of the Commission, testified that he does not know how Campbell ended up working for the Commission and could not offer facts suggesting it was the Commission's decision to hire Patterson, not the City's. Guthrie Dep. at 53.

Accordingly, the Court finds that a fact-finder can reasonably draw two conclusions: (1) the City has some control over the

---

11; City Council Meeting Minutes, docket entry no. 120-6. Further, while the record is unclear as to how Ardis Russell came to monitor the finances of the Commission, it appears that he had some direct ties with the City and reported to the City, not the Commission, regarding the state of the Commission's finances. See id.; see also Patterson Aff. ¶ 4-10.

employment decisions of the Commission, despite the law's guidelines, and (2) the City's action to transfer Henry Campbell to the Commission could be interpreted as being related to Patterson's second surgery and ultimately his termination. To be clear, the Court does not find evidence that the City had "the right to control" Patterson's employment with the Commission or even exercised direct control of the terms of Patterson's employment, but it does find evidence that the City was actively engaged in the employment decisions of the Commission and may have taken action that was directly tied to Patterson's employment with the Commission. If this appears to be a distinction without a difference, the Court can only respond that this finding is a consequence of attempting to wade through the murkiness of current case law. Accordingly, the Court finds that the City and Commission could be considered employers under the ADA and ADEA under the _Trevino_ test.[30]

C. Whether the _Trevino_ Test Should Be Applied

The Court, having reviewed the relevant case law, finds no explanation _why_ government entities should be treated differently from private employers in employment discrimination suits. The

---

[30] The Court considered applying the rebuttable presumption test articulated in _Lyes_. _See_ _Turner_, 476 F.3d at 344 n.3. For the record, the Court notes that its finding would be the same under the Eleventh Circuit's rebuttable presumption test since the presumption to which the City was entitled by law was overcome by evidence of their active involvement in the employment decisions of the Commission. _See_ _Lyes_, 166 F.3d at 1395.

Court, therefore, sees no apparent reason why the <u>Trevino</u> test, or some other analogous test better suited for its purpose, should not apply to government entities since there is no question that Congress intended for private and public employees to enjoy similar protections under Title VII. <u>Moore v. City of San Jose</u>, 615 F.2d 1265, 1272-73 (9th Cir. 1980); <u>Owens v. Rush</u>, 636 F.2d 283, 287 (10th Cir. 1980). Further, a contrary holding seems inconsistent with the well-accepted principle that the term "employer" should be construed liberally in employment discrimination cases. <u>See, e.g.</u>, <u>Quijano v. Univ. Fed. Credit Union</u>, 617 F.2d 129, 131 (5th Cir. 1980).

A total bar to liability may perhaps be intentional and consonant with congressional intent. But precedent in this case seems shaped more by the lack of a suitable test than underlying policy. Some circuits have reached the same conclusion about the limited utility of the NLRB test but have fashioned a substitute test. <u>Lyes</u>, 166 F.3d 1332; <u>Sandoval v. City of Boulder, Colo.</u>, 388 F.3d 1312, 1322 (10th Cir. 2004); <u>Schwarz v. Berrien Springs Police Dept.</u>, 80 FEP Cases 1682, at *9 (W.D. Mich. Aug. 6, 1999) (applying the <u>Lyes</u> test). Other circuits choose to tailor the NLRB test to governmental entities, despite its limitations. <u>Artis v. Francis Howell N. Band Booster Ass'n, Inc.</u>, 161 F.3d 1178, 1184 (8th Cir. 1998); <u>Vandermeer v. Douglas County</u>, 15 F. Supp. 2d 970, 974-80 (D. Nev. 1998); <u>Riley v. Cnty. of Pike</u>, 761 F. Supp. 74, 77 (C.D. Ill.

1991). At least one circuit agrees that the single-employer test is not suited for "cases involving the complex relations between levels of government" and chooses to apply no test. Gulino v. N.Y. State Educ. Dept., 460 F.3d 361, 379 (2d Cir. 2006). And finally, at least two circuits have rejected the usefulness of the NRLB test for aggregating employers in both the government and private contexts. Nesbit v. Gears Unlimited, Inc., 347 F.3d 72, 84-85 (3d Cir. 2003); Papa v. Katy Industries, Inc., 166 F.3d 937, 942-43 (7th Cir. 1999).

In light of the foregoing discussion, this Court finds that, in the absence of clear, precedential authority mandating otherwise, Patterson may aggregate City employees under the single-employer theory. Further, the Court finds that Patterson has produced enough evidence that the City could be his "employer" for the purposes of the ADA and ADEA that he may present this issue to a fact-finder. See Schweitzer, 104 F.3d at 65. Additionally, although there has been little discussion of the matter, the Court finds that under the hybrid test or the Trevino test, the County could not be found to be Patterson's employer subject to his ADA and ADEA claims. There is no evidence that the County played any role whatsoever in Patterson's employment or the employment decisions of the Commission in general. Accordingly, the Court will grant summary judgment in favor of the County with respect to Patterson's ADA and ADEA claims.

*2.  The  Burden-Shifting  Framework  for  Patterson's  ADA  and  ADEA Claims*

The  ADA  forbids  an  employer  from  discriminating  "against  a qualified  individual  with  a  disability  because  of  the  disability  of such  individual  in  regard  to  job  application  procedures,  the hiring,  advancement,  or  discharge  of  employees,  employee compensation,  job  training,  and  other  terms,  conditions,  and privileges  of  employment."  42  U.S.C.  §  12112(a).  A  qualified individual  is  someone  "who,  with  or  without  reasonable accommodation,  can  perform  the  essential  functions  of  the employment  position  that  such  individual  holds  or  desires."  42 U.S.C.  §  12111(8).  Similarly,  the  ADEA  makes  it  unlawful  for  an employer  "to  fail  or  refuse  to  hire  or  to  discharge  any  individual or  otherwise  discriminate  against  any  individual  with  respect  to his  compensation,  terms,  conditions,  or  privileges  of  employment, because  of  such  individual's  age."  29  U.S.C.  §  623(a)(1).  To  be  a qualified  individual  under  the  ADEA,  the  plaintiff  must  be  at  least forty  (40)  years  old.  29  U.S.C.  §  631(a).

Discrimination  claims  are  evaluated  under  a  "tripartite burden-shifting  test"  established  by  the  Supreme  Court.  See Crawford v. Formosa Plastics Corp., 234  F.3d  899,  901-02  (5th  Cir. 2000)  (citing  McDonnell Douglas v. Green,  411  U.S.  792,  802-04 (1973)).  Under  the  McDonnell Douglas  framework,  if  the  plaintiff establishes  a  prima  facie  case  of  discrimination,  the  burden  shifts to  the  defendant  to  provide  a  legitimate,  nondiscriminatory  reason

32

for the alleged discriminatory act. <u>Crawford</u>, 234 F.3d at 902. Having done so, the burden shifts back to the defendant to show that the defendant's nondiscriminatory reason is a pretext for discrimination. <u>Id.</u> (citing <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 142 (2000)).

To establish a prima facie discrimination case under the ADA, a plaintiff must produce evidence to show: "(1) He is disabled or is regarded as disabled; (2) he is qualified for the job; (3) he was subjected to an adverse employment action on account of his disability; and (4) he was replaced by or treated less favorably than non-disabled employees." <u>McInnis v. Alamo Cmty. Coll. Dist.</u>, 207 F.3d 276, 279-80 (5th Cir. 2000)(citing <u>Burch v. Coca-Cola Co.</u>, 119 F.3d 305, 320 (5th Cir. 1997)). The elements of a prima facie case for age-discrimination claims, like all discrimination claims, are substantially similar: (1) the plaintiff must be a member of a protected class, (2) must be qualified for the position, (3) must have suffered an adverse employment action, and (4) others similarly situated must have been more favorably treated. <u>Willis v. Coca Cola Enters., Inc.</u>, 445 F.3d 413, 420 (5th Cir. 2006) (quoting <u>Rutherford v. Harris Co., Tex.</u>, 197 F.3d 173, 184 (5th Cir. 1999)).

## 3. *Patterson's ADA Claim and ADEA Claim*

The Defendants suggest that Patterson has not presented the Court with enough evidence to proceed to trial on his ADA claim. In particular, the Defendants argue that Patterson cannot show that he

was (a) qualified for the position of superintendent or (b) that he
was replaced by a non-disabled employee, and thus he cannot make
out a prima facie case of discrimination. Beyond that, the
Defendants argue that Patterson has proffered no evidence to
suggest that the Commission's legitimate, nondiscriminatory
explanation for the termination of his employment is a pretext for
unlawful discrimination.

*A. Whether Patterson's Factual Averments on his Disability*
*Application Preclude His Argument That He Was Qualified for the*
*Position of Supervisor*

While the present lawsuit was pending in this Court, Patterson
filed a disability claim with the SSA. In his application for
disability benefits, the Plaintiff represented to the SSA that he
became unable to perform his job prior to the termination of his
employment as supervisor. See, Patterson SSA Report at § 2. The
SSA, after considering this evidence, determined that Patterson was
in fact disabled and was eligible to collect SSDI benefits. See DDS
Letter. The Defendants argue that Patterson cannot recover for his
ADA and ADEA claims because specific statements on his SSA
application estop him from now arguing that he is qualified for the
position of supervisor.

The present position in which Patterson finds himself is not
uncommon. See, e.g., Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S.
795 (1999); Giles v. Gen. Elec. Co., 245 F.3d 474 (5th Cir. 2001);
McClaren v. Morrison Mgmt. Specialists, Inc., 420 F.3d 457 (5th

34

Cir. 2005); <u>Reed v. Petroleum Helicopters, Inc</u>., 218 F.3d 477 (5th Cir. 2000). Faced with a similar scenario, the Supreme Court held that receiving SSDI benefits and pursuing a disability claim under the ADA were not inherently contradictory positions and therefore receiving SSDI benefits does not "automatically estop the recipient from pursuing an ADA claim." <u>Cleveland</u>, 526 U.S. at 801. The Court found, however, that courts could not simply ignore the apparent contradictions between the two positions but should afford an ADA plaintiff the opportunity to explain contradictory factual assertions that would "at least superficially appear to negate an essential element of the ADA case." <u>Reed</u>, 218 F.3d at 479 (citing <u>Cleveland</u>, 526 U.S. at 806). The plaintiff's explanation should be "'sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good faith belief in, the earlier statement, the plaintiff could nonetheless perform the essential functions of her job, with or without reasonable accommodation.'" <u>McClaren</u>, 420 F.3d at 463 (quoting <u>Cleveland</u>, 526 U.S. at 807). Typically, the plaintiff's explanation turns on whether the ADA's "reasonable accommodation" requirement affords the plaintiff enough room to maintain the position that he is by definition disabled under the Social Security Act but is qualified for his former position with reasonable accommodation. <u>See, e.g.</u>, <u>Cleveland</u>, 526 U.S. at 807; <u>McClaren</u>, 410 F.3d at 464, <u>Reed</u>, 218 F.3d at 479.

Patterson makes just such an argument.[31] After a careful reading of the above precedent, the Court finds that Patterson's "reasonable accommodation" argument has merit. Patterson made limited specific factual assertions in his application for benefits to the SSA. See McClaren, 420 F.3d at 466 (noting that the difference between the Reed and Giles outcomes was the factual averments made to the SSA). The most substantive of these averments are: (1) "I am unable to do any physical work due my inability to walk" and (2) "I am not able to walk and drive." Patterson SSA Report at § 2. Neither of these factual assertions automatically disqualifies him for the job of supervisor.

As an initial matter, the superintendent job description does not specifically require either the ability to perform manual labor or the ability to walk or drive; instead, the job is entirely supervisory in nature. See generally, Superintendent Job Description. Nevertheless, in his deposition, Patterson stated that it was his custom as supervisor to perform manual labor alongside his employees. Patterson Depo. at 75-76. Further, as an example of the type of work the supervisor might perform, the job description states that the supervisor "may perform manual labor associated with groundskeeping and maintenance of facilities." Id. Just

---

[31] The Court rejects Patterson's argument that he cannot be estopped by statements made on his disability application because the application was completed by Linda Williams. Pl.'s Resp. to Defs.' Summ. J. Mot. at 8-9; docket entry no. 158.

because Patterson routinely performed manual labor or that the supervisor sometimes "may perform" such labor does not override the consideration that the ability to perform physical labor is not an essential or even mandatory component of the supervisor's job. Therefore, Patterson's inability to walk is not fundamentally inconsistent with Patterson's assertion that he was qualified for his position.

Further, the Defendants suggest that Patterson's inability to drive would also undermine his qualification for his former position. Patterson also testified that a significant part of his job was, "go[ing] out every morning to see what need to be did; and if it's not done, [going] back that evening . . . [to] check it." Id. at 75-76. While the inability to drive would presumably hinder his ability to supervise, transportation to and from work sites may be something that could be reasonably accommodated. The Court is not in a position to determine whether the Commission could reasonably accommodate Patterson's transportation needs,[32] but it certainly cannot conclude that Patterson's inability to drive is a per se bar to performing the work of supervisor.

--------

[32] The Defendants do not address the specific reasons why it would be impractical to accommodate Patterson's need for transportation. A reasonable accommodation is defined as "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position." 29 C.F.R § 1630.2(a)(ii).

Yazoo City suggests that Patterson's "reasonable accommodation" argument is not available to him because he never requested accommodation. <u>See E.E.O.C. v. Chevron Phillips Chem. Co., LP</u>, 570 F.3d 606 (5th Cir. 2009). Yet, the City's reliance on this case is not helpful to its cause considering a plaintiff has the burden of requesting accommodation only "where the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer." <u>See</u> <u>id.</u> at 621 (quoting <u>Taylor v. Principal Fin. Grp., Inc.</u>, 93 F.3d 155, 165 (5th Cir. 1996)). As the limitations arising from Patterson's disability should have been open, obvious, and apparent to the Commission, the burden would have rested on his employers to consider whether Patterson required reasonable accommodation.

Finally, the Court acknowledges that Patterson's blanket assertion "I am unable to work" considered in tandem with his statement that he became disabled prior to his second amputation seems contrary to the position he has taken before this Court. Patterson SSA Report at § 2. But considering these statements in a light most favorable to him, they could plausibly be construed as context-related legal conclusions that can be reconciled with his discrimination claims at trial. <u>See</u> <u>Cleveland</u>, 526 U.S. at 802 ("An SSA representation of total disability differs from a purely factual statement in that it often implies a context-related legal conclusion, namely, 'I am disabled for purposes of the Social

Security Act.'"). In sum, the Court finds that Patterson has not made a factual assertion that would estop his ability to pursue his ADA claim or ADEA claim in this Court and therefore should be afforded the opportunity to explain potential discrepancies between his statements to the fact-finder at trial. Id. at 807.

*B. Whether Patterson Has Shown That He Was Replaced by a Non-Disabled Employee*

The Defendants further argue that Patterson cannot show that he was replaced by a younger, non-disabled individual, and therefore his ADA and ADEA claims fail at that prima facie stage. In support of this argument, the Defendants rely on (1) that fact that Campbell's salary and duties, when he was transferred to the Commission, were not identical to Patterson's, and (2) that, when Campbell was eventually promoted to the position of superintendent, his promotion came too late for him to be considered Patterson's replacement.

Both of these arguments, while they have some basis in law, come up short under the present circumstances. First, the Court is satisfied that there is sufficient evidence before it to suggest that Campbell performed enough of the same functions as Patterson to be considered his replacement. Guthrie testified that Campbell was the Commission's "foreman . . . of the parks." Guthrie Dep. at 54-55. When asked whether Campbell "[did] pretty much the same thing that H.L. Patterson did?", Guthrie responded, "No. To some degree, yes, but no." Id. Guthrie, however, elaborated that the

39

critical difference between the job performed by Campbell and the work done by Patterson was that Campbell did not perform budgeting tasks and could not hire employees for the Commission. Id. When pressed on this issue, however, Guthrie could not say whether or not Patterson had ever hired an employee. Id. While it appears that Campbell may have had fewer duties than Patterson,[33] based on the testimony in the record, the Court finds that the plaintiff has proffered sufficient evidence for a fact-finder to find that the so-called "foreman . . . of the parks" essentially performed the same functions as the former supervisor, e.g., oversight of groundskeeping, maintenance, and repair.

As to the point that Campbell received a lower salary for his work and did not officially take the title of supervisor until twenty (20) months after the termination of his employment, the Court finds no authority for the proposition that these factors preclude the above conclusion.[34] Specifically, the timing of

---

[33] Again, while the Court agrees that Patterson was ultimately responsible for the Commission's financial state, see Patterson Dep. at 180, the record suggests that Ardis Russell had some responsibility in monitoring the Commission's finances and budget. See Patterson Aff. ¶¶ 4-10. Taken as true, Ardis Russell's presence with the Commission only underscores the conclusion that the supervisor was primarily responsible for groundskeeping and maintenance of the City and Count's parks and recreational facilities.

[34] The Defendants rely on a number of cases to conclude that Campbell's promotion to supervisor came too late for him to be considered Patterson's replacement. See Watkins v. Sverdrup Technology, Inc., 153 F.3d 1308, 1312-13, 1316 (11th Cir. 1998)(hiring a "replacement" ten months after the termination of

Campbell's promotion is not dispositive in this case in light of
the fact that his transfer to the Commission coincided with the
termination of Patterson's employment. Further, while Campbell's
lesser pay is perhaps evidence that he was not intended to replace
Patterson, it is not conclusive evidence that he did not replace
Patterson.[35] Moreover, this information is neutralized by the timing
of his transfer, which suggests that the Commission (or the City)
intended him to at least serve as stop-gap until Patterson could be
formally replaced. In sum, a commonsense understanding of the word
"replaced" suggests that, based on the evidence before the Court,
the trier of fact could conclude that Campbell "[took] or filled
the place of" Patterson. American Heritage Dictionary 1048 (2d ed.
1991); see St. Mary's Honor Center v. Hicks, 509 U.S. 502, 509-510
(1993).

*C. Whether Patterson Has Produced Enough Evidence of Pretext*

        Progressing to the final stages of the McDonnell Douglas test,

---

plaintiff's employment); Frieze v. Boatmen's Bank of Belton, 950
F.2d 538, 541 (8th Cir. 1991)(five  months after); Sauer v. ICI
Paints in N. Am., 44 F. Supp. 2d 827, 832-33 (W.D. Tex.
1999)(twelve months after). While Sauer suggests that a twelve-
month delay might be too long under any circumstance to consider a
hired employee a replacement for ADEA purposes, none of these cases
relied on timing alone, and all accounted for other facts and
circumstances surrounding the non-replacement's hire. These cases
only serve to underscore the fact-specific nature of this inquiry.

[35] The Court reaches this conclusion without reference to
evidence that the City twice voted to transfer Campbell to the
Commission with a pay equal to Patterson's former pay. See Sept. 8,
2008, Minutes, docket entry no. 120-6 at 30; April 29, 2009, docket
entry no. 120-6 at 37.

the Court finds that the Defendants have produced a legitimate, nondiscriminatory reason for terminating Patterson's employment, thereby meeting their burden of production and shifting the burden back to Patterson to produce evidence that the Defendants' explanation is a pretext for discrimination. See St. Mary's Honor Ctr., 509 U.S. at 510. The Commission, speaking through Guthrie, stated that it fired Patterson for poor job performance. Guthrie testified that the Board grew increasingly dissatisfied with Patterson's overall performance as supervisor and terminated him for that reason alone. See Guthrie Dep. at 32-33. Specifically, Guthrie pointed to Patterson's failure to properly oversee the Commission's funds, neglect of his duty to maintain the parks, and willingness to allow the Commission's equipment to fall into disrepair.[36] See id. at 32-33, 89. Financial records produced by the Defendants corroborate Guthrie's testimony that Patterson did indeed mismanage the Commission's funds. See Nov. 30, 2008 Balance Sheet, docket entry no. 112-6; Commission Oct.-Nov. Profit-Loss Statement, docket entry no. 112-7.

In response to these accusations, Patterson attempts to deflect blame for his poor performance, claiming that management of the Commission's funds was not his ultimate responsibility and that

---

[36] For the record, the Court rejects Patterson's unsubstantiated legal assertion that the Court may not rely on Guthrie's testimony because the Board can only speak through its minutes.

the Board consistently hamstrung his efforts to obtain the funds
and equipment necessary to do his job. See generally, Memo. in
Resp. to City's Summ. J. Mot. at § IV-V, docket entry no. 120.
Although the record is unclear to what role Ardis Russell played in
oversight and management of the Commission's finances, see
Patterson Aff. ¶¶ 4-10, Patterson's blame-shifting effort is not
convincing, particularly since it is a tacit admission that his
supervision was substandard. Multiple times throughout his
deposition Patterson came close to conceding the veracity of the
Defendants allegations, despite many statements to the contrary in
his pleadings. Patterson Dep. at 88-91, 165-68, 179-180, 253.

But, for the purposes of Patterson's ADA and ADEA claims, the
Court's analysis does not turn on whether the Defendants'
allegations are true. Put another way, Patterson does not have to
prove that the Commission's proffered reasons for terminating him
are false, although doing so would perhaps be helpful to his cause,
rather he can prevail by producing evidence that the Commission's
reasons for firing him are a pretext for discrimination. Reeves,
530 U.S. at 147 ("Proof that the defendant's explanation is
unworthy of credence is simply one form of circumstantial evidence
that is probative of intentional discrimination, and it may be
quite persuasive."). The ultimate inquiry in ADA or ADEA cases is
always "discrimination, vel non." St. Mary's Honor Ctr., 509 U.S.
at 519 (quoting U.S. Postal Serv. Bd. of Governors v. Aikens, 460

U.S. 711, 714 (1983)); Reeves, 530 U.S. at 142.

Patterson has consistently argued in all his representations to this Court that the reasons proffered by the Defendants were not the true reasons they fired him. The Defendants counter that, despite the sincerity of Patterson's belief, Patterson has fallen short of meeting his final burden because he has failed to substantiate his claim. See Henry v. Cont'l Airlines, 415 Fed. Appx. 537, 540 (5th Cir. Mar. 3, 2011) (unpublished). In his deposition, Patterson admitted that he has no "direct evidence" of discrimination but relies on circumstantial evidence to bolster his complaint.[37] See Patterson Dep. at 185-88. First, Patterson suggests that the Commission's inability to produce negative performance evaluations or documentation of disciplinary action is evidence that the Commission's reasons for firing him are pretextual. While it not helpful to the Commission's cause that no such written records exist, it is not fatal. The burden remains on Patterson to produce some evidence creating a genuine issue as to whether the Commission fired him because of his age or disability. St. Mary's Honor Ctr., 509 U.S. at 514. Secondly, Patterson argues that timing

---

[37] The Court notes that Patterson's reliance on circumstantial evidence is not as problematic as some of the Defendants suggest. The McDonnell Douglas framework is designed to "allow both plaintiffs and the courts to deal effectively with employment discrimination revealed only through circumstantial evidence." St. Mary's Honor Ctr., 509 U.S. at 526. As the Supreme Court has noted, plaintiff's complaints are often built entirely upon circumstantial evidence because "there will seldom be 'eyewitness' testimony as to the employer's mental processes." Aikens, 460 U.S. at 716.

of Campbell's transfer to the Commission is evidence that the City preferred a non-disabled, younger employee.

Sweeping aside all the testimony, the Court finds that Patterson has produced one document that undermines the credibility of the Commission and creates a genuine issue of material fact as to whether the Commission's and the City's proffered reasons for terminating his employment are a pretext for discrimination. The record clearly indicates that Campbell was transferred from the City to the Commission during the same month that Patterson underwent his second amputation and that Campbell was again transferred to the Commission shortly after Patterson's termination. Sept. 8, 2008, Minutes, docket entry no. 120-6 at 30; April 29, 2009, Minutes, docket entry no. 120-6 at 37. Both times the City voted to transfer Campbell with a salary identical to Patterson's. See Patterson Dep. at 35.

This Court is aware that the timing of Campbell's transfer alone does not constitute conclusive evidence of discrimination. See, e.g., Roberson v. Alltel Info. Servs., 373 F.3d 647, 656 (5th Cir. 2004). That proposition may be true as a general matter, but the Court views this evidence in the context of the record—in this case in light of Patterson's and Guthrie's testimony. Guthrie testified that Patterson's poor performance began long before the termination of his employment, Patterson Depo. at 88-91, yet evidence before this Court suggests that the Commission expressed

dissatisfaction with his employment only after his first amputation and took adverse action after his second amputation. Further, Guthrie's inability to explain how or why Campbell came to work for the Commission only substantiates Patterson's theory that the City and Commission have been less than forthcoming regarding the circumstances surrounding his employment. See Guthrie Depo. at 53.

To be clear, the Court makes no finding as to whether the Commission's stated reasons are indeed pretext for discrimination. There are, of course, many reasonable explanations why the timing of Campbell's two transfers coincided with Patterson's amputation and firing. Indeed, if the Committee had more on which to rely than Guthrie's testimony and his interpretation of a few financial documents, the Court might be more hesitant to deny summary judgment. But given the strength of the Defendant's evidence relative to the evidence produced by Patterson,[38] the Court finds that summary judgment, particularly in a discrimination case, would be inappropriate. See Hayden, 595 F.2d at 997. Based on the

---

[38] The Defendants make much of the fact that Patterson relies heavily on self-serving, and sometimes contradictory, testimony in order to support his discrimination claims. This observation, however, ignores the equally obvious fact that, with the exception of a few financial records, the Commission's evidence is based entirely on Guthrie's ex post facto oral testimony regarding the Board's motive and intent. For the most part, the Commission and the City have countered Patterson's self-serving testimony with their own self-serving testimony. In short, the Defendants' case is open to the same charges it levels against Patterson and the credibility of their stated reasons for terminating his employment are just as vulnerable.

evidence before it, and taking this evidence in a light most favorable to the nonmovant, the Court finds that Patterson has produced enough evidence that a fact-finder could reasonably find in his favor. See Fed. R. Civ. P. 56.

### III. Due Process Claim

Patterson's final claim is a § 1983 claim for violation of his due process rights.[39] 42 U.S.C. § 1983. The Due Process Clause of the Fourteenth Amendment prohibits a state from depriving "any citizen of life, liberty, or property except by due process of the law."  U.S. Const. Amend. XIV, § 1. In order to establish a deprivation of due process the plaintiff must first show that he has an interest subject to Fourteenth Amendment protection. Cabrol v. Town of Youngsville, 106 F.3d 101, 108 (5th Cir. 1997). Then, a plaintiff must demonstrate that the state deprived him of this interest without providing adequate due process of law. Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985). "[O]nce it is determined that the Due Process Clause applies, 'the question remains what process is due.'" Id. (quoting Morrissey v. Brewer,

---

[39] 42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

408 U.S. 471, 481 (1972)). At minimum, the Due Process Clause affords the individual with a threatened protected interest a right to have notice of the charges and the "opportunity to be heard." Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 313 (1950).

*1. Whether Patterson Possessed a Property Interest in His Employment*

What constitutes a legally protected interest is not always easy to determine, but in this case, the Court has no trouble concluding that Patterson had a constitutionally protected property interest in his employment. "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it." Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972). "A public employee has a property interest in her job if she has a legitimate claim of entitlement to it, a claim which would limit the employer's ability to terminate the employment." Johnson v. Sw. Miss. Reg'l Med., 878 F.2d 856, 858 (5th Cir. 1989). Entitlement can be established by an express agreement between the parties or state law or policy. Cabrol, 106 F.3d 101, 106 (citing Roth, 408 U.S. at 577; Loudermill, 470 U.S. at 538; Schaper v. City of Huntsville, 813 F.2d 709, 713 (5th Cir. 1987)). Here, Patterson argues that had a legitimate claim of entitlement to his employment as supervisor by reference to state law. Johnson, 878 F.2d at 858.

Mississippi is an at-will employment state. Roberts v.

48

Walthall Cnty. Gen. Hosp., 96 F. Supp. 2d 559, 562 (S.D. Miss. 2000)(citing Perry v. Sears Roebuck & Co., 508 So. 2d 1086 (Miss. 1987)). As such, there is a general presumption that "an employee who has furnished no consideration in addition to the services incident to his employment may be discharged at the will of his employer." Roberts, 96 F. Supp. 2d at 562 (citing Kelly v. Miss. Valley Gas Co., 397 So. 2d 874 (Miss. 1981)). In this case, however, the general at-will-employment presumption is superceded by Senate Bill No. 2955, which provides that the Commission may "discharge employees when found inefficient or for other good cause." S.B. 2954 § 5 (e), Reg. Sess., 1979 Miss. Laws 943.

The Fifth Circuit has drawn a distinction between those Mississippi statutes which expressly provide a "terminable at will" standard from those that supply a "good cause" standard. Conley v. Bd. of Trs. of Grenada Cnty. Hosp., 707 F.2d 175, 179 n.3 (5th Cir. 1983). The latter standard was held out by the Court as an example of falling on the far end of the spectrum of language that unquestionably affords the subject employee a property interest in his employment. See id. at 179 (noting that the "terminable at will" falls on the other end of the spectrum). Further, under Mississippi law "'where the removal can only be for cause, the [employee] has the right to notice and an opportunity to disprove the charges.'" Roberts, 96 F. Supp. 2d at 562 (quoting In Re:

49

Bishop, 52 So. 2d 18, 20 (1951)).[40]

The Court acknowledges that the Mississippi Supreme Court has considered language that an employer may only terminate an employee "for malfeasance, *inefficiency* or contumacious conduct" as not conferring a property right on the employee. Hall v. Bd. of Trs. of State Insts. of Higher Learning, 712 So. 2d 312, 320 (Miss. 1998) (citations omitted) (emphasis added). Although this language is similar to the language in question, "good cause" is almost universally considered to bestow a property interest in favor of the employee. See, e.g., Redd v. Nolan, 663 F.3d 287, 297 (7th Cir. 2011); Preston v. City of Pleasant Hill, 642 F.3d 646, 651 (8th Cir. 2011); Royster v. Bd. of Trs. of Anderson Cnty. Sch. Dist. No. Five, 774 F.2d 618, 620 (4th Cir. 1985). Id. Accordingly, the Court finds such language "create[d] a legitimate expectation of continued employment" and therefore that Patterson had a constitutionally protected property interest subject to the protections of the Fourteenth Amendment. Roth, 408 U.S. at 577.

*2. Whether Patterson Was Denied Due Process of Law*

"An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'"

---

[40] The holding in In re: Bishop was based purely on the court's interpretation of a Mississippi statute (that did not expressly mention "good cause") and makes no mention of constitutional rights. See In Re: Bishop, 52 So. 2d at 18.

Loudermill, 470 U.S. at 542 (quoting Mullane, 339 U.S. at 313). The principal has been interpreted to require something less than "the judicial model of an evidentiary hearing", Mathews v. Eldridge, 424 U.S. 319, 348 (1976), but, at minimum, the person in jeopardy of loss requires some pretermination opportunity to present his "side of the story." Loudermill, 470 U.S. at 542 (quoting Barry v. Barchi, 443 U.S. 55, 65 (1979)).

   In addition to denying the existence of a property right, the Defendants argue that Patterson received whatever process was owed him. Patterson refutes this statement, claiming ignorance of the Board's impending decision. The Parties' contrary positions in part are predicated on their varying interpretations of what "notice" is sufficient to charge Patterson with the obligation to present his side of the story prior to termination. The Defendants understand notice to mean any knowledge of the Board's dissatisfaction with Patterson's job performance, while Patterson interprets notice to require some type of formal charge.

   There is no question that Patterson was aware that some of the commissioners were dissatisfied with his job performance and that his job was in jeopardy. Guthrie testified that the new commissioners contacted Patterson prior to his termination and gave him a list of list of things he needed to improve. Guthrie Dep. at 46-47. This story is corroborated by Patterson's own deposition in which he acknowledged that he was aware the he could be fired.

51

Patterson Dep. at 61, 189. Patterson testified that around the middle of March, 2009, Patterson heard from "people in general" that he was going to be fired. Id. at 145-46. In his deposition, when pressed on whether he learned this information from a specific commissioner, he admitted he could not remember. Id. at 146.

Yet, despite the Board's demand for improvement and knowledge that "he would be fired", Patterson appears not to have understood the Board's demand for improvement as instituting some sort of probationary period after which his performance would be evaluated by the Board. Morever, Patterson appears to be unaware that the future of his employment with the Commission would be decided at the April 1, 2009, meeting. In fact, there is only strained evidence that the Board ever formally raised or discussed Patterson's performance prior to this meeting.[41] It is entirely plausible based on the record that the day he learned that charges had been officially brought against him was the day Guthrie informed him that the Board had terminated his employment.

In each instance where a court has considered whether a minimum amount of due process was met, the respondent was notified of the pendency of some final action that could adversely affect

---

[41] The Defendants read much into the February 11, 2009, Minutes of the Commission; however, the minutes do not reflect the Board's dissatisfaction with Patterson's work or that the Board determined that "they would effectively have to start from scratch". See County's Summ. J. Memo. at 8, docket entry no. 113; City's Summ. J. Memo. at 6, docket entry no. 106.

his rights and that a response was necessary in order to prevent final adjudication of the matter. See generally, In re Kendavis Holding Co., 249 F.3d 383 (5th Cir. 2001); In re Christopher, 28 F.3d 512 (5th Cir. 1994); Arnett v. Kennedy, 416 U.S. 134 (1974). Indeed, knowledge of a proceeding that will be "accorded finality" is fundamental to any notice requirement. Mullane, 339 U.S. at 314. Otherwise, the right "to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest." Id.

The wisdom of this precedent is born out in the present context. It would be counterintuitive to require Patterson to show good cause why the Commission should not terminate his employment without sufficient facts indicating that he received definite notice that the termination of his employment was being formally considered by the Board. To hold otherwise would impose upon Patterson the obligation to respond to every unofficial complaint or rumor, regardless of the context or source. Moreover, the Commission's position that Guthrie and the commissioners demanded Patterson improve his performance "or else" only underscores the importance of providing a hearing prior to making a final decision. Had Patterson known that time for satisfying the Commission's demands for improvement had expired, he could have attempted to provide some evidence that he had in fact complied with the

Commission's requests or offer an alternative explanation as to why he should not be fired. The opportunity to offer his side of the story is exactly what the Due Process Clause affords. <u>Loudermill</u>, 470 U.S. at 543. Therefore, the Court finds that Patterson's knowledge of the Board's general dissatisfaction with his work or his awareness of rumors that his firing was imminent does not constitute notice sufficient to charge him with the obligation to present his side of the story.

Finally, the Court dismisses the notion that Guthrie's brief discussion with Patterson after the Board had voted to terminate his employment afforded Patterson the right to be heard. <u>See</u> Patterson Dep. 149-50 (stating that Guthrie told him he was fired on April, 2, 2009); April, 1, 2009, Minutes (providing that Patterson's last day would be April 15). Guthrie presented Patterson with the choice to resign or be fired. Each "choice," regardless of the semantics, led to the same unavoidable result. The Board made its decision when it unconditionally voted to terminate Patterson's employment. Had Patterson prevailed upon Guthrie not to fire him, Guthrie had no authority to override the unanimous will of the Commission and reinstate him to former position. The Court does agree with the Commission that, due to its limited resources, even the slightest opportunity to present his side of the story would have been enough to comport with the

Minimum requirements imposed by the Due Process Clause.[42] See Mathews, 424 U.S. at 348. Nothing in the record, however, definitively supports the Commission's conclusion that Patterson was afforded a *meaningful* opportunity to be heard. Loudermill, 470 U.S. at 543 (citing Goss V. Lopez, 419 U.S. 565, 583-584; Gagnon v. Scarpelli, 411 U.S. 778, 784-786 (1973)). Accordingly, the Court cannot agree from the record before it that Patterson received the process he was due.[43]

The Court, however, stops short of granting summary judgment in Patterson's favor. While the Commission's understanding of notice may be overbroad for summary judgment purposes, there is a genuine issue of material fact as to what exactly was communicated to Patterson regarding the Board's intentions in the days and

---

[42] There is some suggestion in the Defendants' briefs that perhaps Patterson should have requested a post-depravation hearing. The Defendants have not advanced an important interest that would justify prompt action and the postponement of a hearing. See Fed. Deposit Ins. Corp. v. Mallen, 486 U.S. 230, 240-41 (1988). Considering the record in this case and the nature of Patterson's former position, the Court entertains serious doubts whether such interest could be found.

[43] Additionally, for the reasons stated above, the Court rejects the Defendants' argument that such a hearing lacked probable value. This legal conclusion relies heavily on the Defendants prevailing belief that Patterson cannot recover for his ADA or ADEA claims. If at trial Patterson can show that this termination was not related to the reasons stated by the Defendants, then it follows that he could have at least theoretically convinced the Commission that the reasons it provided were not the true reasons why they contemplating terminating his employment. In short, Patterson's prejudice claim is linked in part to his ADA and ADEA claims.

months leading up to the termination of his employment. For instance, the details of Patterson's conversation with Guthrie and the other commissioners about his poor performance are unclear,[44] and Patterson could not say who told him that the Board intended to fire him shortly before his employment was terminated. Patterson Dep. at 145-46. Taking the evidence in a light most favorable to the Defendants, it is possible that testimony at trial will reveal that Patterson received adequate notice of his impending termination sufficient to charge him with the obligation to seek a hearing with the Commission, and therefore the Court will deny summary judgment as to all Parties.

*3. Whether the County Can Be Liable for the Commission's Possible Due Process Violation*

The final question this Court must address is whether the County can be held liable for any potential due process violations committed by the Commission. The County and Commission, having focused exclusively on the issue of whether they can be considered "employers" under the ADA and ADEA, only briefly address this issue in their briefs. Similarly, Patterson makes a very brief argument that under Monell v. Dep't of Soc. Servs. the County is liable for the Commission's possible violation of Patterson's due process rights because it had a "custom" of ignoring the formal legal

---

[44] Guthrie, it appears, interpreted his conversation as providing Patterson a definite amount of time to improve his performance before he was to be fired. Guthrie Dep. at 46-47.

distinctions between the separate entities. 436 U.S. 658 (1978).

Patterson, however, misunderstands Monell. Monell addressed whether municipalities qualified as 'persons' within the meaning of 42 U.S.C. § 1983. Id. at 662. The Court held that a local government is responsible under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts [an] injury." Id. at 694. As a practical matter, there is no evidence to suggest that the County and Commission had a custom of commingling funds or sharing resources. Further, even if they did, an unofficial policy of sharing resources did not cause the injury about which Patterson complains. Patterson's "Monell" argument, in essence, is a veiled attempt to transform Monell into a vehicle for making a respondeat superior-type argument–an argument foreclosed by Monell itself. Id. at 692. Accordingly, because Patterson does not offer any theory under which the County can be considered subject to § 1983 liability for the constitutional violations of the Commission, the Court will also grant summary judgment in favor of the County with respect to Patterson's due process claims.

## IV. Disposition

For the foregoing reasons, the Court finds that Patterson has adduced evidence of enough specific facts that all of his claims against the Commission and the City may proceed to trial.

57

Conversely, the Court concludes that the Commission and City have raised a genuine issue of material fact as to whether Patterson received due process, and therefore summary judgment in his favor is not warranted. Because there is no evidence, however, that the County played any role in the employment decisions of the Commission or made any decisions related to Patterson's employment with the Commission, the Court finds it is entitled to summary judgment as a matter of law with respect to all of Patterson's claims.

**IT IS, THEREFORE, HEREBY ORDERED** that the Plaintiff's Motion for Partial Summary Judgment [**docket entry no. 104**] is **DENIED.**

**IT IS FURTHER ORDERED** that Yazoo City's Motion for Partial Summary Judgment [**docket entry no. 105**] is **DENIED.**

**IT IS FURTHER ORDERED** that Yazoo Recreation Commission's Motion for Summary Judgement [**docket entry no. 108**] is **DENIED.**

**IT IS FURTHER ORDERED** that Yazoo County's Motion for Summary Judgement [**docket entry no. 112**] is **GRANTED.**

**IT IS FURTHER ORDERED** that Yazoo Recreation Commission's Supplemental Motion for Summary Judgment [**docket entry no. 145**], joined by Yazoo County [**docket entry no. 154**], is **DENIED.**

**IT IS FURTHER ORDERED** that Yazoo City's Supplemental Motion for Summary Judgment [**docket entry no. 149**], joined by Yazoo

County [**docket entry no. 153**], is **DENIED.**

So **ORDERED** this the 24th day of February, 2012.

<u>   /s/ David Bramlette      </u>

**UNITED STATES DISTRICT JUDGE**